851 F.2d 1479
 271 U.S.App.D.C. 252
 KANSAS POWER AND LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mesa Operating Limited Partnership, Mobil Oil Corp., et al.,
Arco Oil & Gas Co., Sun Exploration & Production Co., Oxy
USA, Inc., Southern Natural Gas Co., Columbia Gas
Transmission Corp., Williams Natural Gas Co., Amoco
Production Co., Anadarko Petroleum Corp., Colorado
Interstate Gas Co., Phillips Petroleum Co., Phillips 66,
Intervenors.
KANSAS POWER & LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Phillips Petroleum Co., et al., Intervenors.
 Nos. 87-1366, 87-1422.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 9, 1988.
Decided July 19, 1988.
 
 Martin J. Bregman, with whom John K. Rosenberg, Topeka, Kan., William I. Harkaway and Steven J. Kalish, Washington, D.C., were on the brief, for petitioner.
 Hanford O'Hara, F.E.R.C., with whom Catherine C. Cook, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent. John Estes, F.E.R.C., Washington, D.C., also entered an appearance, for respondent.
 
 
 1
 Michael L. Pate, Tulsa, Okl., with whom Edgar K. Parks, Houston, Tex., for Mobil Oil Corp., et al.; William H. Emerson, Tulsa, Okl., Kevin M. Sweeney, Washington, D.C., for Amoco Production Co.; Norma J. Rosner, Dallas, Tex., for Arco Oil & Gas Co.; Gary M. Prescott, Amarillo, Tex., Nancy J. Skancke, Washington, D.C., for Mesa Operating Ltd. Partnership; Charles L. Spann, Dallas, Tex., Thomas J. Eastment, Washington, D.C., for Sun Exploration and Production Co.; Gordon Gooch, Katherine B. Edwards, Washington, D.C., for Anadarko Petroleum Corp.; and Charles L. Pain, Bartlesville, Okl., for Phillips Petroleum Co.; were on the joint brief of intervenors, Oxy USA, Inc., et al. Jay G. Martin, Houston, Tex., also entered an appearance, for intervenor, Mobil Oil Co., et al.
 
 
 2
 Donna J. Bailey, Birmingham, Ala., entered an appearance, for intervenor, Southern Natural Gas Co.
 
 
 3
 Richard L. Gottlieb, Charleston, W.Va., entered an appearance, for intervenor, Columbia Gas Transmission Corp.
 
 
 4
 Gregory Grady, Douglas O. Waikart, Washington, D.C., and John H. Cary, Tulsa, Okl., entered appearances, for intervenor, Williams Natural Gas Co.
 
 
 5
 Donald C. Shepler, Daniel F. Collins and Steven A. Taube, Washington, D.C., entered appearances, for intervenor, Colorado Interstate Gas Co.
 
 
 6
 John L. Williford, Charles L. Pain and Jennifer A. Cates, Bartlesville, Okl., entered appearances, for intervenor, Phillips Petroleum Co., et al.
 
 
 7
 Before WALD, Chief Judge, and STARR and SILBERMAN, Circuit Judges.
 
 
 8
 Opinion for the court filed by Chief Judge WALD.
 
 WALD, Chief Judge:
 
 9
 This is a challenge to four orders of the Federal Energy Regulatory Commission (FERC)[1] granting or extending "limited-term abandonment" (LTA) authorizations to certain natural gas pipelines and producers. Basically, LTAs authorize the temporary abandonment of previously approved interstate sales of gas, if the producer and original pipeline-purchaser agree to release the gas from the terms of their sales contract; the purpose of the LTA program is to enable producers to sell gas that would otherwise be shut-in while relieving pipelines of increasingly burdensome take-or-pay obligations. See Joint Appendix (J.A.) at 91, 95.
 
 
 10
 In contrast to past LTAs granted by the Commission, the LTA orders on review here were granted for all categories of gas requested, not just for "new" gas subject to a maximum lawful price in excess of that prescribed under Sec. 109 of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. Sec. 3319. Relying primarily on this difference, petitioner Kansas Power and Light Company (KPL), a pipeline customer, intervened in the proceedings on the abandonments requested by the producers and pipelines, demanding pre-authorization hearings on the impact of the proposed LTAs on its principal supplier, the Williams Natural Gas Company (WNG). See, e.g., J.A. at 11-13, 38-39. The Commission denied KPL's requests for evidentiary hearings, reasoning that the interests of KPL and other pipeline customers were adequately protected because any pipeline's decision to release gas under an LTA would be subject to prudence review in future rate proceedings. See, e.g., id. at 96. After its petition for rehearing was denied, KPL appealed to this court. We hold that the Commission's action was a reasonable exercise of its discretion in this area; its approval of these LTAs was altogether consistent with the agency's abandonment policy as it has evolved in the last several years. We affirm all four of the Commission's orders.
 
 I. BACKGROUND
 A. Regulatory and Economic Context
 
 11
 The Natural Gas Act of 1938 aimed to ensure interstate gas consumers adequate supplies at reasonable prices. See, e.g., California v. Southland Royalty Co., 436 U.S. 519, 523, 98 S.Ct. 1955, 1957, 56 L.Ed.2d 505 (1978). Section 7(b) of the NGA, the abandonment provision, "was one aspect of Congress' scheme to protect natural gas consumers from exploitation." Consolidated Edison Co. of New York, Inc. v. FERC, 823 F.2d 630, 632 (D.C.Cir.1987) (Con Ed ). Section 7(b) provides that natural gas producers may not abandon facilities or services subject to the jurisdiction of the Commission without first obtaining Commission approval. "An 'abandonment' within the meaning of section 7(b) occurs whenever a natural gas company permanently reduces a significant portion of a particular service." Reynolds Metals Co. v. FPC, 534 F.2d 379, 384 (D.C.Cir.1976). Before approving abandonment, the Commission must find that "the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 15 U.S.C. Sec. 717f(b). Until recently, the Commission employed a "comparative needs test" to determine whether "the present or future public convenience or necessity" permitted abandonment. Under that test, the Commission weighed the needs of current consumers of the gas against the needs of proposed new consumers, with "the burden of proof ... on the applicant for abandonment to show that the ... public interest 'will in no way be disserved' by abandonment." Transcontinental Gas Pipe Line Corp. v. FPC, 488 F.2d 1325, 1328-29 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226 (1974) (quoting Michigan Consolidated Gas Co. v. FPC, 283 F.2d 204 (D.C.Cir.), cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960)).
 
 
 12
 In 1978 the NGPA did away with the pervasive regulatory scheme of the NGA and erected in its place a deregulated natural gas market for most "new" gas developed after 1978. However, "old" gas--i.e., gas already "committed or dedicated to interstate commerce," 15 U.S.C. Sec. 3301(18)--remained subject to the requirements of the NGA, including the abandonment requirements of Sec. 7(b). See Con Ed, 823 F.2d at 633.
 
 
 13
 In part because of the supply incentives created by the NGPA and in part because demand for gas "declined significantly on the interstate systems [due to the] increased price and decreased perceived value of gas," the shortage of gas in the interstate market in the 1970s evolved into a surplus of gas in the early 1980s. Pierce, Reconstituting the Natural Gas Industry From Wellhead to Burnertip, 9 ENERGY L.J. 1, 12 (1988); see Maryland People's Counsel v. FERC, 761 F.2d 768, 771 (D.C.Cir.1985). During the same period, pipelines bound by take-or-pay provisions in their contracts[2] began incurring enormous liabilities for gas they were obligated to pay for but were unwilling to take because they could not sell gas in the market in volumes and rates commensurate to their contractual commitments. To the extent pipelines did take gas, they took more expensive gas "because it [was] generally subject to more onerous take-or-pay requirements than the low-cost gas"; as a result, many "low cost supplies of gas [were] shut-in in favor of higher takes of more expensive supplies." Con Ed, 823 F.2d at 634 (quoting the Commission).
 
 
 14
 Confronted with this state of the natural gas industry, the Commission took various steps to modify the traditional ways in which gas was sold in interstate commerce. One such step was the announcement in 1985 of a new abandonment policy. See Felmont Oil Corp. & Essex Offshort, Inc., 33 F.E.R.C. p 61,333 (1986), rev'd & remanded sub nom., Con Ed, 823 F.2d 630. According to the Commission, its prior comparative needs test, which was designed to deal with problematic supplies, no longer made sense with the introduction of deregulation and competition into the market. See Con Ed, 823 F.2d at 634. Thus, "[i]nstead of comparing the needs of the current consumers against the needs of identified specific new consumers, the Commission announced that it would now compare the needs of the current consumers against the benefit that would accrue to the natural gas market as a whole were the facilities in question released from Commission jurisdiction." Id. at 632 (emphasis added). On appeal, this court, without quarrelling with the Commission's new public interest test, reversed the agency because the Commission's abandonment rationale failed adequately to deal with the "take or pay" problems of the pipelines. Noting the Commission's "refusal to face the fact that burdensome take-or-pay contracts will not go away through deregulatory actions that ... actually appear to place more pressure on pipelines," we remanded for the Commission to take a "harder look at the purported benefits of the looser abandonment policy." Id. at 642. On remand, the Commission stated it was addressing the concerns of the court but eventually reinstated its original determination in favor of the requested abandonment. See Felmont Oil Corp. & Essex Offshore, Inc., 42 F.E.R.C. p 61,172 (1988).
 
 
 15
 Meanwhile, in 1985 the Commission had begun issuing limited-term abandonments. Essentially, LTAs authorize the abandonment of sales by producers to pipelines of NGA-jurisdictional gas for a limited period, to the extent that such gas is released from contract by the original pipeline-purchaser; the released gas may then be sold by the producers to third parties on the spot market. See J.A. at 91. The LTAs enabled producers to sell on the interstate market gas that would otherwise be shut-in and at the same time to relieve pipelines of increasingly burdensome take-or-pay obligations. See id. The first set of LTAs granted by the FERC authorized abandonment only for gas which could be sold at a maximum lawful price in excess of that prescribed under Sec. 109 of the NGPA (i.e., Sec. 102(d) and Sec. 108 gas). See Tenneco Oil Co., et al., 33 F.E.R.C. p 61,134 (1985) (granting 32 LTA applications). Other such "blanket" orders for abandonment followed shortly thereafter. See, e.g., Columbia Gas Transmission Corp., et al., 33 F.E.R.C. p 61,233 (1985); Amoco Prod. Co., et al., 33 F.E.R.C. p 61,173 (1985); Vesta Energy Co., et al., 33 F.E.R.C. p 61,326 (1985). All of these orders for abandonment were conditioned on agreement between the pipelines and producers. In addition, all the abandonment authorizations carried strict time (one year or less) limits, and producers were required to report periodically to the Commission on any sales made under the LTA program.
 
 
 16
 In 1986 a second group of LTA authorizations occurred. See, e.g., Columbia Gas Transmission Corp., et al., 34 F.E.R.C. p 61,407 (1986); Marathon Oil Co., 34 F.E.R.C. p 61,417 (1986); Transcontinental Gas Pipeline Corp., et al., 36 F.E.R.C. p 61,128 (1986). These were granted on essentially the same terms as the original authorizations. However, in at least one such case, e.g., Pennzoil Producing Co., et al., 34 F.E.R.C. p 61,318 (1986), the Commission granted LTA authority for all NGPA gas price categories requested, not just gas priced above the Sec. 109 level. See J.A. at 94, 96.
 
 B. The Orders Under Review
 
 17
 The orders at issue here resulted from applications for renewal of LTA authority filed by the pipelines and producers. In response to the applications, petitioner KPL filed various motions to intervene, requesting that adjudicative hearings be held to determine whether the LTA authorizations would have a detrimental impact on KPL and its customers. The Commission denied KPL's request for an evidentiary hearing and granted the LTA applications--again for periods not exceeding one year. See, e.g., id. at 96, 153. As in Pennzoil, LTA authorizations were granted not just for gas priced above the Sec. 109 level but for all NGPA price categories requested, including low-cost gas. See id. at 96. The Commission reasoned that in accordance with Sec. 7(b) the public interest and necessity required abandonment authorization, because the market as a whole would benefit from the availability of gas that would otherwise be shut-in. See id. at 94-95. In the FERC's words, "[producers] are still faced with excess deliverability due to decreased needs of their pipeline purchasers and could sell excess gas elsewhere while providing substantial benefits to the releasing pipelines in the form of take-or-pay relief. Substantial volumes of gas might be shut-in absent continued LTA authorization." Id. at 95. Also, the Commission found "that the abandonments ... provide benefits to all segments of the natural gas industry, including consumers." Id. at 153.
 
 
 18
 The Commission rejected KPL's contention that a trial-type adjudicative hearing was required to determine whether the LTAs would increase costs to pipeline customers; according to the agency, KPL's argument that LTAs "may increase costs to captive customers fails to recognize that pipeline operations are subject to a prudence challenge by any party in the pipeline's rate proceedings." Id. at 44. The agency also stressed that the abandonment granted was "based upon mutual agreement; WNG [Williams Natural Gas (KPL's pipeline supplier) ] must agree to the release of gas before sales to WNG can actually be abandoned." Id. at 94-95; see id. at 152-53. On these grounds, the Commission found that no formal hearing was required as a prerequisite to granting the LTAs. In addition, as in Pennzoil, "the Commission ordered [the applicants] to file quarterly reports incorporating pertinent information concerning sales of gas authorized to be abandoned, since a portion of the gas to be released [is] low-cost gas in which the Commission has a continuing regulatory interest." Id. at 96. "Such reports shall include origin of the gas, purchaser, volume of the sales, price charged for such sales, and the amount of take-or-pay relief credited to the pipelines for each sale." Id. at 154.
 
 
 19
 On rehearing, the Commission further explained why a hearing was not required: because KPL's interests were adequately protected by the availability of prudence review and by the condition of the order that none of pipelines' existing obligations to their customers be altered and because KPL "has not shown that disputed issues of material fact exist which would require a hearing." Id. at 124, 170-71. Following issuance of the orders on rehearing, these petitions for review were filed.
 
 II. DECISION
 
 20
 A. Was KPL Entitled to a Trial-type Hearing?
 
 
 21
 Section 7(b) of the NGA requires "permission and approval" from the Commission prior to abandonment of certain sales for resale in interstate commerce, after "due hearing." 15 U.S.C. Sec. 717f(b). KPL contends that Sec. 7(b) required a trial-type adjudicative hearing in the instant case in order to determine the potential impact of the LTA authorizations on WNG and on customers of WNG such as KPL. We find no merit to KPL's claim. It is well-established that the Commission need not hold an evidentiary hearing when no issue of material fact is in dispute. See, e.g., Ohio Power Co. v. FERC, 744 F.2d 162, 170 (D.C.Cir.1984); Public Serv. Co. v. FERC, 600 F.2d 944, 955 (D.C.Cir.), cert. denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979). KPL has raised no specific issues of disputed fact, only allegations of possible future harm. KPL does not, for example, dispute that because of oversupply problems, producers were losing revenues due to shut-in gas supplies while pipelines were incurring increasing liabilities under their take-or-pay contracts. Nor does KPL dispute that the LTAs were designed to ameliorate these problems and to benefit "all segments of the natural gas industry, including consumers" by making available gas that would otherwise be shut-in. Lastly and most important, KPL does not challenge the FERC's determination that the LTA authorizations will have no effect on the pipelines' existing obligations to customers such as KPL. See J.A. at 153 ("[T]he authority granted herein does not alter pipelines' existing obligations to their customers."). Rather, the crux of KPL's claim is that the Commission should have provided a formal hearing to determine whether, under the newly-expanded LTA authorization, low-cost gas would "be released [by pipelines] and moved to other markets" to the potential future detriment (with regard to rates and service levels) of pipeline customers like itself. KPL's Reply Brief at 6-7.
 
 
 22
 In our view, it was a reasonable exercise of the Commission's discretion to conclude that the "disputed issue" raised by KPL was too speculative to warrant a trial-type hearing at this stage. "[T]he standard of review which applies to an agency's decision to forego an evidentiary hearing in the absence of a disputed factual issue is quite narrow." Cerro Wire & Cable v. FERC, 677 F.2d 124, 129 (D.C.Cir.1982). Moreover, "[m]ere allegations of disputed facts are insufficient to mandate a hearing," and this circuit has in the past accorded considerable deference to determinations by the Commission that the petitioner failed to "make an adequate proffer of evidence to support [its allegations of disputed facts]." Id. (citing General Motors Corp. v. FERC, 656 F.2d 791, 798 n. 20 (D.C.Cir.1981)). In addition, it is settled that the Commission has broad discretion "to order its business as it [sees] fit and to leave petitioners to their remedies in another proceeding," Southern Union Gas Co. v. FERC, 840 F.2d 964, 971 (D.C.Cir.1988), as well as to decide what procedures to use in fulfilling its statutory responsibilities, see Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-45, 98 S.Ct. 1197, 1211-12, 55 L.Ed.2d 460 (1978). Here, the FERC concluded that a formal hearing in advance of the LTA authorizations was unnecessary because consumer interests would adequately be protected through other procedural safeguards, including: the limitation of the LTA authorizations to one year; the imposition of reporting requirements; and the availability of prudence review in future pipeline rate proceedings. Given the broad discretion of the Commission in deciding these issues, we uphold the agency's determination that KPL's allegations of possible future harm were too speculative to warrant a pre-authorization adjudicative hearing and that any challenges to the LTAs would most logically be conducted in the pipelines' rate proceedings.[3]
 
 
 23
 B. Did the Commission Violate Its Own Abandonment Policies?
 
 
 24
 KPL's other contention is that the Commission's LTA authorization orders were inconsistent with its own abandonment policies, as expressed in Felmont Oil Corp. & Essex Offshore, Inc., 33 F.E.R.C. p 61,333 (1985). Specifically, KPL claims that "the Commission did not follow its order in Felmont " because it did not "determine whether detriment to existing customers was outweighed by benefits to the market as a whole"; rather, the Commission "merely made conclusory remarks concerning the effects of the releases upon existing customers while it failed to consider KPL's concerns over the potential effects upon them." KPL's Reply Brief at 6 (emphasis added).
 
 
 25
 We disagree. The LTA orders were specifically intended to benefit "the national market as a whole" by increasing the flexibility of producers and pipelines to move gas supplies to meet consumer demand. J.A. at 95, 152-53. As the Commission explained, "[producers] are still faced with excess deliverability due to decreased needs of their pipeline purchasers and could sell excess gas elsewhere while providing substantial benefits to the releasing pipelines in the form of take-or-pay relief. Substantial volumes of gas might be shut-in absent continued LTA authorization." Id. at 95. Also, the Commission found "that the abandonments ... provide benefits to all segments of the natural gas industry, including consumers." Id. at 153 (emphasis added). Thus, the fundamental design of the LTA program is consistent with Felmont, in which the FERC explicitly shifted the identification of the public interest away "from the interest of only specific customers to the interest of the market as a whole." 33 F.E.R.C. p 61,657; see also Con Ed., 823 F.2d at 643 ("We agree with the FERC that the 'public convenience or necessity' language of [NGA Sec. 7(b) ] envisions agency policy-making to fit the regulatory climate.").
 
 
 26
 Furthermore, the orders on review hardly represent a "marked shift" in agency policy. To the contrary, they are more reasonably seen as a natural extension of the Commission's evolving abandonment policy. As early as 1983, the Commission began dealing with the problem of gas surplus by implementing so-called "special marketing programs" (SMPs). In these programs, the Commission provided for blanket abandonment and resale authority under NGA Sec. 7 for gas released by pipelines to be sold to fuel-switchable end users (i.e., customers capable of purchasing another fuel instead of gas) in exchange for take-or-pay credits to the pipeline from which the gas was released.[4] In 1985, the Commission issued its first LTAs--which were basically the former SMPs, with some adjustments--but originally only for gas that was subject to a maximum lawful price in excess of that prescribed under NGPA Sec. 109. And in 1986, the Commission issued several orders--virtually identical to the ones at issue here--which permitted the voluntary release and resale of not just Sec. 109 gas but of low-cost NGA Secs. 104 and 106 gas as well. See, e.g., Pennzoil Producing Co., 34 F.E.R.C. p 61,318 (1986).
 
 
 27
 Finally, we believe the Commission adequately addressed the impact of the LTA authorizations on existing pipeline customers; it expressly determined "that the authority granted herein does not alter pipelines' existing obligations to their customers" and that "[t]he action taken is not intended to affect contractual claims and defenses arising under any pipeline's gas purchase contracts." J.A. at 153. Indeed, apart from calling them "conclusory," KPL does not seriously contest the Commission's determinations. We also reject KPL's claim that the Commission contravened its order in Felmont by failing to consider the potential impact of the LTAs on consumers. In fact, the Commission in the present case made clear that the pipelines would ultimately be responsible to its customers for any "consequent effects [of the LTAs] on adequacy of gas supplies and reasonableness of gas costs." Id. And, as we held above, the agency's conclusion "that the better place to consider the issue of the effect of the LTAs on customers' future rates is in the pipelines' rate proceedings themselves" was a reasonable exercise of the Commission's discretion. Commission's Brief at 14. We therefore conclude that the Commission did not act in violation of its own policies in granting the latest round of LTA applications.
 
 III. CONCLUSION
 
 28
 For the reasons stated above, we conclude first that it was within the Commission's broad discretion to grant the requested LTAs, without evidentiary hearings in advance but with the opportunity to challenge the prudence of the abandonments in future pipeline rate proceedings; and second that the Commission's approval of the LTAs was in accord with the agency's general abandonment policy, as it has evolved in the last several years. The four FERC orders on review are therefore
 
 
 29
 Affirmed.
 
 
 
 [1]
 The four orders on appeal are: Odeco Oil and Gas Company, 38 F.E.R.C. p 61,343 (March 31, 1987), (Odeco I); Odeco Oil and Gas Company, 39 F.E.R.C. p 61,283 (June 1, 1987) (Odeco II); Phillips Petroleum Company, 39 F.E.R.C. p 61,243 (June 1, 1987) (Phillips I); and Phillips Petroleum Company, 40 F.E.R.C. p 61,115 (July 31, 1987) (Phillips II)
 
 
 [2]
 Due to pressure from the Commission, pipelines "typically purchased gas under contracts for very long terms." Associated Gas Distributors v. FERC, 824 F.2d 981, 995 (D.C.Cir.1987) (citing 18 C.F.R. Sec. 2.61). "[T]he contracts commonly included 'take-or-pay' provisions, requiring the pipeline to pay for some specified percentage, say 75%, of the deliverable gas even if it took less ... [T]he take-or-pay provisions effectively committed the pipelines to high gas costs in what by 1982 proved to be a time of falling prices, both for competing fuels and for substitute supplies of gas not covered by contract." Id. at 995-96
 
 
 [3]
 In its brief, KPL asserts that prudence review is "a poor substitute for before the fact scrutiny of proposed abandonments." KPL's Brief at 18. To support its assertion, however, KPL simply cites a few instances in which it experienced "substantial delays." We agree with the Commission that without more, these assertions are not enough to warrant a formal evidentiary hearing at this stage. See Commission's Brief at 14 n. 4. ("[A]t most KPL's argument goes to the question as to the proper expedition of rate proceedings in this case.")
 
 
 [4]
 The court invalidated the SMP programs on the narrow ground that the Commission had failed to provide a reasonable basis for its decision to exclude from the SMP programs the pipelines' "captive customers"--i.e., "those customers with no readily available alternative source of fuel." Maryland People's Counsel v. FERC, 761 F.2d 768, 774 (D.C.Cir.1985). The Commission subsequently addressed this court's concerns in its Order No. 436 series. See FERC Statutes and Regulations p 30,665 (1985) (Order No. 436), modified, Order No. 436-A, FERC Statutes and Regulations p 30,675 (1985), modified further, Order No. 436-B, FERC Statutes and Regulations p 30,688 (1986), vacated and remanded sub nom. Associated Gas Distributors v. FERC's, 824 F.2d 981 (D.C.Cir.1987)